FILED

2008 Mar-31  PM 04:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **DENISE FREEMAN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:07-CV-665-RDP** |
| | } | |
| **U.S. MARSHAL SERVICE,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Doc. # 4) filed on June 12, 2007. On July 23, 2007, the court converted this motion into one for summary judgment under Fed. R. Civ. P. 56, and ordered additional briefing. The motion has been fully briefed by the parties and came under submission on August 8, 2007. For the reasons set forth below, the court finds Defendant's Motion for Summary Judgment is due to be granted, and this case should be dismissed.

## I.    STATEMENT OF FACTS

This is a personal injury action under the Federal Tort Claims Act ("FTCA"). 28 U.S.C. §§ 1346(b)(1). On July 12, 2004, Plaintiff Denise Freeman, who has an implanted spinal cord stimulation device, was made to pass through a metal detector as part of a security screening at the Anniston Federal Courthouse, suffering injury as a result. (DEX-1, Plaintiff's Complaint ("Complaint"), ¶ 7 ). Plaintiff filed her administrative claims within the two-year statute of limitations contained in the FTCA, but her husband failed to file a claim and now any action he may have had is time-barred. (Complaint, ¶ 6; DEX-2, Declaration of Gerald M. Auerback ("Auerback Declaration"), ¶¶ 4-5).

Pursuant to a contract with the U.S. Marshal Service ("USMS"), Court Security Officers ("CSOs") provided building security at the Anniston courthouse.[1] (DEX-3, Declaration of Judene Tippett ("Tippet Declaration"), ¶ 4; *see also* DEX-3, Contract of May 30, 2000 ("Contract"); and DEX-3, CSO Post Orders of June 2003 ("Post Orders")).  In July 2004, all the CSOs on duty at the courthouse were employees of AKAL Security, Inc. ("AKAL"), a private security company. (Tippet Declaration, ¶ 4).  The contract that governed the relationship between the government and AKAL was signed on May 30, 2003.  (Contract, A-1)  Under the Contract, the CSOs were responsible for performing the district courthouse's identification entrance system which included operating the security screening equipment, including a  metal detector.  (*Id*. at C-5).  The metal detectors at the courthouse were owned by the United States government but manned by the CSOs for use in security screening.  (*Id*. at C-32).  The government trained the CSOs on the proper use of the screening equipment.  (*Id*.).  To oversee AKAL's performance of the Contract, the government employs a deputy United States Marshal to serve as the Contracting Officer's Training Technical Representative ("COTR").  (Tipett Declaration, ¶¶ 1-2; Contract, G-1).  The Contract lays out the wage schedules for all CSOs and the COTR is the only person who can authorize overtime for CSOs. (Contract, B-2 and C-23).  The CSOs receive "special, limited deputation" from the USMS to give them the authority needed to carry out their security role.  (*Id*. at C-27).

When she came to the courthouse for jury duty, Plaintiff instructed the CSOs serving on July 12, 2004 that she had an implanted medical device that prevented her from going through the metal detector.  (PEX-B Affidavit of Denise Freeman ("Freeman Affidavit"), ¶ 3).  She showed the CSOs

---

[1] In the Eleventh Circuit, USMS, for the time period in question, had contracted with AKAL to provide court security services. (*Id.* at ¶ 3).

her implanted device identification card.  (PEX-A, Plaintiff's FTCA claim with U.S. Marshals Service ("FTCA Claim"), 3).  However, a CSO wearing a United States Marshal badge threatened to arrest Plaintiff if she did not pass through the metal detector, and so Plaintiff submitted to the screening.  (Freeman Affidavit, ¶ 4.)  As a result of passing through the metal detector, Plaintiff claims to have suffered physical pain and emotional distress.  (Complaint, ¶¶ 11-12; FTCA Claim, 3).

## II.   STANDARD OF REVIEW

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson,* 477 U.S. at  248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

3

The method used by the party moving for summary judgment to discharge its initial burden on the motion depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more   than a simple statement that the non-moving party cannot meet its burden at trial. But it does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115–16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or

4

ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   DISCUSSION

This motion presents a single issue that this court must determine: whether CSOs are "employees of the government" under the Federal Tort Claims Act.  As both sides have acknowledged in their briefs, federal courts have developed the "control test" to determine whether a contract employee of the federal government is a federal employee or an independent contractor. *Means v. United States*, 176 F.3d 1376, 1379 (11th Cir. 1999); *see United States v. Orleans*, 425 U.S. 807, 814 (1976) (stating that "[a] critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor'") (*quoting Logue v. United States*, 412 U.S. 521, 528 (1973).  The control test states that "a person is not an 'employee of the government' for the purposes of the FTCA unless the government controls and supervises the day-to-day activities of the individual." *Means*, 176 F.3d at 1379.

No precedent in the Eleventh Circuit answers squarely the question presented by this motion, though there is well-developed law governing the application of the control test.  In *Means*, the Eleventh Circuit held that a Jefferson County SWAT team was not under the control of the government when it executed a narcotics raid in coordination with the FBI.  *Id.*  The *Means* opinion is significant because it established the control test in this circuit.

After *Means*, the Eleventh Circuit decided *Patterson & Wilder Construction Co., Inc. v. United States*, 226 F.3d 1269 (11th Cir. 2000).  The *Patterson & Wilder* decision clarified that whether control exists must be determined by looking to "the *entire* relationship between the parties with respect to the project at hand."  226 F.3d at 1276 (emphasis in original).  The facts in *Peterson & Wilder* are as follows: Patterson and Wilder Construction leased a plane.  *Id.* at 1270.  The company was approached by Reynolds, a pilot who flew drugs to Columbia for DEA or Customs drug interdiction operations, and it agreed to allow Reynolds to use the plane.[2]  *Id.*  Reynolds presented himself as a "confidential source," not an agent or employee, of the DEA or Customs Authority.  *Id.*  Reynolds and others were briefed extensively on the proposed operation and flew the plane to Columbia, stopping at various United States military bases on the way.  *Id.* at 1271.  In Columbia, the operation went awry and ended with Reynolds and his associates in Columbian custody.[3]  *Id* at 1272.  The Columbian police, attempting to confiscate the plane, crashed it on takeoff, destroying both engines and props.  *Id.*  Patterson and Wilder Construction sued the government for damages to the plane, claiming that an employee of the government had taken the plane without the company's authorization.  *Id.*

The district court, relying on *Means*, granted summary judgment for the government.  *Id.*  The Eleventh Circuit reversed, finding that a genuine issue of material fact existed as to whether the government exercised  sufficient control over the operation to make Reynolds and the other alleged

_____

[2]The parties disputed who, if anyone, actually gave Reynolds permission to use the plane. *Patterson & Wilder Constr.*, 226 F.3d at 1270.

[3]A Columbian drug dealer, the target of the interdiction operation, bribed the Columbian authorities and secured the release of Reynolds and his associates. *Patterson & Wilder Const.*, 226 F.3d at 1272.

tortfeasors employees of the government. *Id* at 1274. The court noted that the common law of agency applies to the control test because agency law looks at the entirety of the relationship between the alleged principal and agent, not merely isolated transactions between them. *Id.* at 1276. The opinion stresses that "it is not necessary that the Government continually control all aspects of the individual's activities, so long as it has the authority to do so given the nature of task." *Id.* at 1274. The court also distinguished *Means*:

> [In *Means*], although federal agents briefed local officers before the operation in question, they did not set plans for the local officers' primary task (entering and securing the house), and instead left that task almost entirely to the officers' planning and discretion. Moreover, here the Government's involvement in the mission (and interaction with the pilots) went significantly beyond merely briefing the pilots or supplying them with background information. In addition, the local officers in *Means* were not to receive any direct payment from the United States, and were performing duties within the ambit of their normal responsibilities as local law enforcement employees involved in a joint investigation.

*Id.* at 1277.

The facts of this case fall somewhere between *Means* and *Patterson & Wilder*. The government has more control over the activities of the CSOs than the FBI had over the Jefferson County SWAT Team, but less control that the DEA had over Reynolds. A close examination of the relationship as a whole, however, leads this court to find that the CSOs are independent contractors and not employees of the government for purposes of the FTCA. The court reaches this conclusion by looking at the entire contractual relationship between the government and AKAL, evidence outside of the contract, and by consulting persuasive authority.

### A.    The Contract

Unlike the situations in *Means* and *Patterson & Wilder*, a written contract defines the relationship between AKAL and the United States Marshal Service. The existence of this contract

greatly simplifies the inquiry required by the control test because this contract purports to define the nature of the parties' relationship (*i.e.*, as principal/agent or client/independent contractor).  *See Birchem v. Knights of Columbus*, 116 F.3d 310, 312 (8th Cir. 1997) ("In applying the common law of agency test, the Supreme Court looks at a large number of factors that define the parties' total contractual relationship") (citing *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-53 (1989)); *see also Patterson & Wilder*, 226 F.3d at 1276 (citing the above-quoted language from *Birchem*).  While the written contract is not all of the evidence this court must consider in determining the degree of control the government exercised over the CSOs, the contract provides a clearer place to begin the inquiry than existed in either *Means* or *Patterson & Wilder*.

The contract analysis will be divided into two stages.  The first stage examines whether the CSOs should be considered federal employees under the general terms of the contract.  The second stage looks more closely at the specific actions that gave rise to this action to determine whether the general pattern of the contract applies to those specific actions.

## I.    CSOs Under the Contract

The Contract defines the roles and responsibilities of the parties.  According to the Contract language, USMS views court security as one of its "major responsibilities" (Contract, C-1).  While the USMS retains "overall responsibility for orchestrating federal court security activities," it has long "sought the services of the private sector to provide highly qualified, highly skilled individuals to assist in this effort."  (*Id*.).  The USMS contracted with AKAL to provide security services.  (Tippett Declaration, ¶ 3).

The Contract sets up a command structure.  The CSOs report to a Lead Court Security Officer ("Lead CSO").  (Contract, C-4).  The Lead CSO reports to a Marshal designated as the Contracting

Officer's Technical Representative ("COTR").  (*Id*. at G-1).  Among other things, the COTR is

responsible for providing post orders and standard operating procedures for each CSO post (*id*. at

C-4), assigning and scheduling patrol routes (*id*. at C-5), authorizing CSO overtime (*id*. at C-26), and

directing CSOs to "[p]erform other court security related duties."  (*Id*. at C-6).  The COTR also  has

the duty to inspect, accept, and evaluate the services performed by AKAL.  (*Id*. at E-1).  Beyond the

formal roles, the Contract also sets up a more general hierarchy.  The Contract includes several sets

of regulations controlling CSO clothing, weight, fitness, weapons proficiency, fluency in English,

education, and personality.  (*Id*., C-9–36).  The government retains the authority to "remove" any

CSO from performing services under the Contract if the CSO fails to meet the Contract's standards

or if the CSO commits a crime or firearms violation.[4]  (*Id*. at H-2).

        Plaintiff argues that the COTR's broad authority and the specific regulations contained in the

Contract give the government sufficient authority over the actions of the CSOs to make them

government employees for purposes of the FTCA.  The court disagrees for several reasons.  The first

of these reasons is fundamental: the CSOs are not parties to the Contract.  The Contract is between

the government and AKAL, and it requires AKAL to hire and provide CSOs to perform security

tasks.  The CSOs have no duties under the Contract and the government has no contractual recourse

against the CSOs as employees of AKAL.  This degree of separation is evidence that the CSOs are

not government employees; however, the court recognizes that government control can arise out of

the Contract even where the CSOs are not explicitly bound by it.  Therefore, while the existence of

the Contract, a factor absent in both *Means* and *Patterson & Wilder*, does not conclusively establish

---

[4]In addition, there is a procedure by which AKAL can petition the government to allow an
underperforming CSO to continue providing services.  (Contract, H-2).

that the CSOs were independent contractors on the date of the alleged injury, it is certainly relevant to that issue and points towards a conclusion that the CSOs are not under government control.

Based upon a review of the terms of contract itself, it appears that, while the Contract does give the government some degree of power over the CSOs, the government's power does not rise to the level of control. This fact is shown in the verbs used in the Contract. The verbs evoke independent contractor status, not control. The COTR's role is couched in terms common to contractor relations, *e.g.*, accept, inspect, assign, remove and authorize. (*See* Contract, E-1 and G-1). The Contract provides that if the government is dissatisfied with the performance of a CSO, it can "remove" the individual from performing services. (*Id.* at H-2). The Contract does not say that the government can "fire" or "terminate" the CSO.[5] The government's power is limited to the power to prevent a noncomplying CSO from working in the courthouse. Though the power to remove gives some degree of control to the government, it is a far lesser degree of control than would exist than if the government could fire a CSO outright.

Plaintiff points out that the government has placed at least some requirements on almost every aspect of the CSOs' duties. She argues that the sheer quantity of regulations related to a CSO's work creates control for purposes of the FTCA. The court agrees with Plaintiff that the government has included a large number of CSO regulations in the Contract, but Plaintiff's argument otherwise misses the mark. The question of control has both quantitative and qualitative components. The caselaw requires this court to examine not only the areas in which the government has made specific

---

[5]Plaintiff states in her Response to Defendant's Motion for Summary Judgement that the Contract "gave the U.S. Marshals Service the right to *terminate* any employee who failed to meet the government's qualifications standards...." (Doc. # 16, 4) (emphasis added). Though Plaintiff provides citations in this section of her brief, the word "terminate" is never used in the portions of the Contract to which she cites.

requirements, but the degree of control that arises from those requirements. *See Patterson & Wilder*, 226 F.3d at 1276 (stating that "it is essential to consider the entire relationship between the parties"). The critical inquiry is not whether the government places requirements on many areas of a contractor's performance, but whether the government controls the day-to-day, detailed physical performance of the contractor's duties. *Logue*, 412 U.S. at 527-28. The mere listing of government requirements, such as Plaintiff has highlighted, does not suffice to show actual control. Looking at the whole relationship, the court finds that the Contract does not give the government the degree of control required to find that the CSOs were government employees. Regulations governing items such as dress, minimum performance standards, travel reimbursement, and overtime hardly form the basis for controlling the day-to-day activities of the CSOs.[6] The undisputed facts show that AKAL was responsible for hiring and providing general training to the CSOs in accordance with the government standards. (Contract, C-27). AKAL tendered these trained-to-specification CSOs to the government for acceptance or rejection. The mere existence of government standards does not create control. *Orleans*, 425 U.S. at 816 (stating that "by contract, the Government may fix specific and precise conditions to implement federal objectives. Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs or of state governmental bodies into federal governmental acts"). Moreover, although the government executes substantial control over the use of deadly force and gives daily orders to the CSOs, even complete control over these areas does not require a finding that the government has control over the CSOs.

---

[6]It is important also that the Contract does not give the government control over these areas; it gives the government a right to reject any noncomplying CSO.

These areas are but facets of the total job entrusted to the CSOs by the Contract.[7]

Plaintiff also argues that one provisions of the Contract requires the COTR to exercise direct control over the Lead CSO, and that this provision creates a material issue of fact as to the existence of control.  The Contract provision at issue reads, in full:

> The [Lead CSO] shall coordinate daily activities at his or her appointed facility directly with the COTR to:
> (I)     determine any changes which may be required in the daily routine;
> (ii)    assure all CSOs are in proper uniform and all Government issued equipment and property is accounted for;
> (iii)   *provide a direct degree of supervision for the daily work of the CSOs*; and
> (iv)    act as liaison between the Contract Manager or Site Supervisor and the COTR.

(Contract, C-4) (emphasis added).  Plaintiff asks the court to interpret this provision as giving the COTR a degree of control over the CSOs, but a closer reading  of the provision and a look at the provision as a whole lead to a different conclusion.  First, the subject of the sentence is the Lead CSO and the verb is "shall coordinate."  The sentence is imperative; it states what the Lead CSO must do.  The prepositional phrase "with the COTR" defines with whom the Lead CSO must coordinate, and the infinitive phrases in each of the numbered sub-parts state the specific tasks that the Lead CSO is responsible for coordinating.  The court interprets this sentence to place duties on

---

[7]It is easy to identify areas where the Contract could have been written differently to give the government "control."  The government could have provided for direct supervision of the CSOs, perhaps requiring a Marshal to oversee the various posts at which CSOs serve.  The government could have hired the CSOs directly, instead of relying on AKAL and reserving the right to reject CSOs that do not meet minimum standards.  The government could have paid the CSOs directly instead of paying AKAL.  Instead, the government contracted with AKAL to provide and pay CSOs. The CSOs handled duties delegated to them by the Marshals, and they did so independently of government supervision or oversight.  The supervision that does exist under the Contract, as discussed *supra*, is aimed at accepting or rejecting the services provided, not directing the CSOs' performance of their duties.

the Lead CSO, not on the COTR.  The imperative "shall coordinate" does not apply to the COTR.[8]

This interpretation is confirmed by looking at both the whole provision and the whole Contract.  It is hornbook law that "[a] contract will be read as a whole and every part will be read with reference to the whole."  11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 32:5 (4th ed. 2007).  The provision is listing the duties of the Lead CSO and is surrounded by provisions listing the duties of the other contractor positions.  It would be odd indeed for the Contract to outline a major duty for the COTR in a section about the Lead CSO's duties, especially when, in another section of the Contract dealing with the COTR's obligations, the list of the COTR's duties is silent about direct supervision of the CSOs.  (Contract, G-1).

Other areas of the Contract imply that it is the Lead CSO and not the COTR that is responsible for supervising the CSOs.  In a section dealing with emergencies, the Contract states that a United States Marshall will contact both the COTR and the Lead CSO.  (Contract, C-25).  If the COTR had responsibility for supervising the CSOs, notifying the Lead CSO would be redundant and a waste of time in an emergent situation.

Furthermore, the specific responsibilities other than supervision that are listed in the provision (such as accounting for equipment and checking for any special daily assignments) are elsewhere listed as responsibilities of AKAL, not of the government.  Government equipment is "furnished to the Contractor" and the Contractor is responsible for maintenance and replacing any lost equipment.  (*Id*. at C-31).  The Contract assigns responsibility for managing equipment to AKAL

---

[8]Further support for the court's interpretation comes from the fact that sub-part iv of the provision requires the Lead CSO to act as a liaison between the COTR and the senior representatives of the contractor.  If the imperative command of the provision applied to the COTR, this provision would not make sense.

employees, and the provisions governing the Lead CSO's duties provide a means for the government to ensure that the AKAL employees are doing their jobs in accordance with the Contract. There is no reason to interpret one sub-part of this provision different than the others. Just as the government checks to be sure that the AKAL employees properly maintain equipment, it also confirms that the AKAL employees are under sufficient supervision to ensure that their job tasks are carried out. The COTR is elsewhere given the power to reject AKAL services that do not conform to the Contract, and there is no reason for this court to construct an exception to that general rule for this provision. (*Id*. at G-1). If the Lead CSO does not provide sufficient supervision to assure that the CSOs do their jobs, the COTR can reject the services. This analysis leads to the same conclusion as a plain reading of the Contract: the provision at issue unambiguously requires the Lead CSO to supervise the CSOs and does not create supervisory powers or duties in the COTR.

In summary, the court finds that there is no genuine issue of material fact on the issue of control under the terms of the Contract. Under the applicable Eleventh Circuit caselaw, the terms of the Contract do not give the government the power to control the day-to-day activities of the CSOs. However, full analysis of this case requires the court to look beyond the mere contract terms to see if any other facts or events on the day of the incident create a triable issue of fact with respect to the question of control.

### ii.     CSOs on the Day of the Incident

While there is very little evidence before this court on the issue besides that contained in the Contract, it is important that this court consider whether any facts beyond the Contract create a control issue that may not appear in the Contract. *See Patterson & Wilder*, 226 F.3d at 1276 (emphasizing the importance of examining the "*entire* relationship between the parties with respect

14

to the project at hand")(emphasis in original).  The Contract states that CSOs are responsible for "entrance control," which includes "operating security screening equipment."[9] (Contract, C-5).  Both sides admit that the people operating the screening equipment were AKAL employees, though Plaintiff asserts that the AKAL employees should be considered United States Marshals because they identified themselves as Marshals.[10]  No facts in the Rule 56 record suggest that a United States Marshal was present at the screening site or that the CSOs attempted to contact a Marshal for advice about the situation.  Nor is there anything in the record to suggest that the CSOs had special instructions or were operating under regulations inconsistent with the roles established by the Contract.  In short, there is no evidence that the situation at the Anniston Courthouse deviated from the Contract at all.  Because this court has already determined that the CSOs are not under government control by the terms of the Contract and because there are no special circumstances which exist to show that the government was exercising more authority than specified in the Contract, the court finds that the independent contractor exception to the FTCA, as it has been interpreted by the Eleventh Circuit, applies to this case.

**B.    Other Evidence**

Plaintiff does not limit her argument to issues related to the control test.  She  also argues that the fact that the CSOs identified themselves as United States Marshals and wore Marshal uniforms and badges creates a genuine issue of fact as to whether the CSOs are Marshals.  The court disagrees.  The implication of Plaintiff's argument is that someone other than the government would be able to abrogate sovereign immunity outside of the FTCA.  Plaintiff has cited no authority on this issue.

---

[9]There is no dispute that the screening equipment belonged to the government.

[10]The court will address this line of argument in the next section.

15

Moreover, such a ruling would create an exception to the control test that would amount to ignoring it altogether.[11]  The *Means* case, which unequivocally adopted the control test, is binding.  *Means*, 176 F.3d at 1379; *Patterson & Wilder*, 226 F.3d at 1274.  Therefore, Plaintiff's resort to tests other than the control test are unavailing.

### C.   Persuasive Authority

Both Plaintiff and Defendant cite several persuasive cases in their briefs, and several of those cases are substantially factually similar to this case and help to further illuminate the reasons why summary judgment is due to be granted in favor of Defendants.  Chief among these cases is *Warden v. Department of Justice*, 1994 WL 551364 (9th Cir. Oct. 7, 1994), an unpublished decision of the Ninth Circuit.[12]  In *Warden*, the court addressed the precise issue before this court: whether CSOs hired by a security contractor are government employees under the FTCA.  The *Warden* court stated the facts as follows:

> [the] USMS controlled the location and number of CSO posts; the hours worked per day and per week; the nature of CSO duties required to meet security needs; reporting and record-keeping requirements; appropriate emergency responses; length and frequency of coffee and lunch breaks; ultimate duty locations and/or nature of temporary duty; CSO orientation requirements; CSO minimum qualifications; minimum weapons proficiency requirements; a dress code for CSOs; qualifications for deputation; and CSO's duties regarding grand juries, opening and closing court, preserving order, and serving as court messenger.  Appellant also alleges that USMS

---

[11]Plaintiff asks this court to find that the CSOs clothing and self-identification are determinative of their status as government employees.  Under the control test, these two factors are relevant but not themselves determinative.  Plaintiff's approach would create a way around the control test that is without support in the caselaw.

[12]The *Warden* decision, being both foreign to this jurisdiction and unpublished, binds neither this court nor courts in the Ninth Circuit; however, this court is persuaded by the reasoning in that case.  It is purely, and soundly, persuasive authority that confirms what the Eleventh Circuit's precedents hold.  This court agrees with the court in *Patterson & Wilder*: "[s]imply put, our decision does not turn on these or any other Ninth Circuit decisions."  226 F.3d at 1277, n.6.

has authority to remove him from his duties as a CSO and that [the security contractor] was acting under USMS orders when it discharged him from employment.

*Warden*, 1994 WL 551364 at *1.  The court applied the control test and found that the CSO was not a government employee under the FTCA: "Though the government necessarily requires CSOs, consistent with their function, to work certain hours in certain places, to keep certain records, to do certain duties, and to meet certain training requirements, these requirements are. . . 'designed to secure minimum safety, not to control the detailed physical operation of the job.'" *Id.*, at *2 (*quoting Letnes v. United States*, 820 F.2d 1517, 1519 (9th Cir. 1987)).  This opinion strongly supports the control test analysis undertaken by this court.

Plaintiff attempts to distinguish *Warden* on two grounds.  First, she argues that *Warden* involved wrongful discharge whereas this case involves a personal injury.  Plaintiff does not explain why the nature of the alleged tort should cause this court to reach a different outcome, and no statutes or cases cited to this court suggest that the FTCA treats different torts differently when addressing the issue of control.[13]  The difference between the tort in *Warden* and the alleged tort in this case has no legal significance.  Thus, the first attempt at distinguishing *Warden* is unavailing.

Plaintiff's second argument is that there appears to be no COTR in the *Warden* case.  She asserts that the COTR gives the government more control over the daily operations of the CSOs. The court disagrees.  The list of government-mandated duties and requirements in *Warden* are almost

_____

[13]Clearly, the Federal *Tort* Claims Act only applies to torts, so the traditional agency distinction between tort and contract liability has no application here.  28 U.S.C. § 1346(b)(1) (abrogating sovereign immunity in "civil actions on claims against the United States, for money damages. . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment").

identical with list in this case.  The mere existence of a designated representative does not, without more, increase the degree of control exercised by the government.  For Plaintiff's second argument to succeed there would have to be some evidence that the COTR had a direct supervisory role, but the court has already determined that there is no substantial evidence of that fact.  Accordingly, both of Plaintiff's arguments fail to show why *Warden* should be distinguished from the case before the court, and as a result, the court finds *Warden* to be persuasive.

*Brooks v. A.R. & S. Enterprises, Inc.*, 622 F.2d 8 (1st Cir. 1980) is another case that is similar to this one.  The plaintiffs in *Brooks* sued the government after their daughter was injured in a car crash at the Roosevelt Roads Naval Air Station.  *Brooks*, 622 F.2d at 9.  The car that hit the plaintiffs was owned by the government but driven by a security guard employed by AR & S, a contractor providing security at the base.  *Id.*  The plaintiffs contended that the government had control over the AR & S, but the court, in an opinion written by Judge Wisdom, rejected all four of the plaintiffs' arguments.  First, the court held that "[c]ontracts typically define the parameters of the contracting parties' responsibilities.  That AR & S personnel were to perform tasks specified in a contract negotiated at arm's length does not bear, however, on the critical question of whether the government supervised the daily activities of the guards."  *Id.* at 11.

Second, the court rejected the argument that the government had control of the guards because of the specific qualifications contained in the contract:

> [t]he Navy had a legitimate interest in assuring the security of the base and the suitability of AR & S personnel for guard duty, but the government's authority under the safety program to screen applicants and to discharge guards who threatened military security did not constitute control within the meaning of the FTCA.

*Id.*

18

The third argument, that the government had control because the guards were using government equipment, was likewise found to be unavailing.  The court found that mere evidence of use was insufficient to show control because "the Navy did not supervise the manner in which AR & S used government property."  *Id.*

Finally, the court was not persuaded that the existence of a government supervisor created control.  Judge Wisdom wrote:

> [t]he plaintiffs emphasize that a Navy security officer was authorized to conduct daily inspections of guard activities and to alter work assignments in accordance with the Navy's needs.  The exclusive purposes of these inspections was to ensure that AR & S fulfilled it obligations under the contract.  Courts applying the FTCA have consistently held that a government's right to inspect the work of a contractor and stop work that does not conform to the terms of the contract does not constitute control over the contractor's employees. . . . *The right to inspect does not nullify the general rule that the government is not liable for torts of independent contractors.*

*Id.* at 12 (citations omitted)(emphasis added).

The *Brooks* decision addresses many of the issues in the instant case.  Plaintiff has raised each of the theories advanced by the *Brooks* plaintiffs: she has emphasized the contract terms, the use of government property, and supervisory role of the COTR.  *Brooks* is consistent with  this court's reading of Eleventh Circuit caselaw, and is strongly persuasive.

Against these cases, Plaintiff advances the reasoning of *Canady v. United States*, 155 F.Supp. 2d 1379 (M.D.Ga. 2001) and *Provancial v. United States*, 454 F.2d 72 (8th Cir. 1972).  These cases lack the factual similarity of the cases discussed above and display less persuasive logic.  *Canady* involves claims made against Verna Wesby Hudson, an employee of a county government whose salary was paid by the United States Department of Agriculture ("USDA").  *Canady*, 155 F.Supp. 2d at 1381.  Hudson was involved in a car accident and was sued in her individual capacity.  *Id.* at

19

1379-80. The United States moved to have it substituted as the proper defendant instead of Hudson, arguing that Hudson was under government control. *Id.* at 1380. The district court, relying on *Means* and *Patterson & Wilder*, found that Hudson was under government control and thus the claims against her were dismissed because the plaintiff did not comply with the FTCA's administrative prerequisites. *Id.* at 1383. According to the court, no evidence showed that the "county committee was involved in the daily operation of the Burke's County FSA or otherwise controlled Hudson's daily activities." *Id.* The USDA supplied handbooks, bulletins, and mailings to instruct Hudson in her work, and provided all of her salary and benefits. *Id.* The *Canady* decision presents a significantly different set of facts than those involved in this case. Unlike in *Canady*, the CSOs are paid by AKAL, are under the direct supervision of the lead CSO, and have wide latitude in performing their jobs. The decisive factor in *Canady* was that the USDA was the only entity that had any control over Hudson. *See id.* at 1382-83. Moreover, the court finds that the differences between the agricultural work in *Canady* and the security work in the present case are substantial enough to render *Canady* as having little persuasive value. As a result, *Canady* has only minimal value in helping this court address the problems before it, and to the extent that it is helpful, it is helpful to the government's case.

*Provancial* is more factually similar to the present case, but is suffers from poorly-developed reasoning. In *Provancial*, two Mission, South Dakota police officers allegedly failed to get a man they arrested medical attention after he suffered an eye injury. 454 F.2d at 73. Because the officers were deputized by the Bureau of Indian Affairs, the plaintiff claimed that the officers were employees of the government under the FTCA and sued the government. *Id.* at 75. The court agreed with the plaintiff, reasoning that the officers "were acting on behalf of a federal agency. . . in an

official capacity. . . and while so acting were temporarily in the service of the United States albeit without compensation." *Id.* The court did not apply the control test at all, applying instead a form of identity test that has not been advanced in this case before this court and which does not apply in this Circuit. Because it does not give the court any guidance as to how to apply the control test, *Provancial* is not persuasive and does not help Plaintiff's case.

The weight of these cases from other jurisdictions strongly supports this court's application of the independent contractor exception to the FTCA in this case. These persuasive authorities (and particularly those that are factually similar and well-reasoned) suggest that security contractors using government equipment without direct government supervision are commonly found to fall outside of government control. The decisions in these cases indicate the court is correctly applying Eleventh Circuit caselaw and that Defendant is entitled to summary judgment because the CSOs are not employees of the government under the FTCA.

## IV.    CONCLUSION

For the foregoing reasons, the court concludes Defendant's Motion for Summary Judgement is due to be granted, and this case will be dismissed. The court will enter a separate order in accordance with this memorandum opinion.

**DONE** and **ORDERED** this 31st day of March, 2008.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE